THE PERU and THE RELIEF.

(District Court, D. Oregon. December 24, 1898.)

No. 4,247.

COLLISION—STEAM AND SAILING VESSELS—LIABILITY OF TUG AND TOW.

A ship, in tow of a steamtug, on a hawser about 175 fathoms long, but having her sails set to assist the tug, was making from seven to eight miles an hour when she collided with a schooner making five or six miles. The collision occurred in the daytime, on a clear day, and the vessels had been within sight of each other for a number of hours, and for some time their courses had been converging. The schooner had the right of way, under the sailing rules, and properly kept her course. The tug and ship kept on their course, with the apparent intention of crossing ahead of the schooner, in violation of the rules, until it was seen to be impossible, in reliance on an erroneous belief that the schooner intended to change her course, after which the tug attempted to sheer and pass the schooner's stern, but the ship failed to follow, and the collision resulted. There was a pilot on board the ship, to whose orders the tug was subject, but no orders were given. *Held*, that both tug and ship were in fault.

This was a libel in admiralty for collision by Peter Nelson and others, owners of the schooner Orion, against the German ship Peru and the tugboat Relief.

Williams, Wood & Linthicum, for libelants.

Snow & McCamant and Davis, Gantenbein & Veazie, for the Peru and U. Ohling, master.

Andros & Frank, for the Relief.

BELLINGER, District Judge. On the 4th day of October, 1897, the schooner Orion was beating up the coast off the mouth of the Columbia river, bound for Shoalwater Bay, when she came in collision with the German ship Peru, in tow of the tug Relief, bound for the port of Astoria, on the Columbia river. The collision took place between 4 and 5 o'clock in the afternoon. There was no fog, and the weather was clear. The wind was from the northwest, and inshore was a good beating breeze, but offshore it was blowing about 15 miles per hour. Inshore the sea was pretty smooth, but offshore it was about half rough. The Orion was keeping close in, to get the benefit of smooth water, and had been making short tacks at intervals during the day. The vessels had been in sight of each other since the forenoon, the schooner then being a little to the north of Tillamook Rock, and the ship to the north and west of the schooner, off the Columbia river. The schooner at this time was heading for Point Adams. After getting close in, she stood out on a long tack up the coast; and, after making a short tack to a point opposite the end of the Columbia river jetty, she was put upon her starboard tack,—her last tack to the place of collision. Her course then was between W. and W. $\frac{1}{2}$ S. It was about 4 o'clock in the afternoon when the schooner was put upon this last tack. The ship Peru had taken Pilot Wood on board, and about half past 3 o'clock in the afternoon was put upon the port or inshore tack, and was soon after taken in tow by the tugboat Relief. After being taken in tow, the foresail, mainsail, and crossjack of the ship were furled. The remainder of the sails were kept set, in order to assist the tug in making the entrance into the river. The tug and ship were making from 7 to 8 miles per hour, and the Orion from 5 to 6 miles. The hawser by which the ship was towed was probably about 175 fathoms in length. The courses of the tug and tow and of the schooner converged into one another. The first and second mates of the Peru took the bearings of the Orion from time to time while the vessels were approaching each other, and the captain and some of the sailors considered the probabilities of a collision, but all concluded that the vessels would clear if they kept on their respective courses; while Pilot Cordiner, who was on the tug, came to the conclusion, while the vessels were two or three miles apart, that, if they kept on their courses, they would come together. It seems inexplicable that in these circumstances a collision should have occurred. The explanation is that the master of the Orion, having the right of way, expected that the tug and tow would keep out of his way; while the officers on the tug and ship were of the opinion that the schooner, from her position inshore, was making for the Columbia river, and expected her to tack to starboard at any moment, and follow in their wake. The officers in charge of both vessels relied upon this assumption until a collision was imminent, and when such efforts to avoid it as were then made were too late.

Among the regulations prescribed by congress to prevent collisions at sea are the following:

"Art. 17. When two sailing vessels are approaching one another, so as to involve risk of collision, one of them shall keep out of the way of the other as follows, namely: * * * (b) A vessel which is close-hauled on the port tack shall keep out of the way of a vessel which is close-hauled on the starboard tack."

"Art. 20. When a steam vessel and a sailing vessel are proceeding in such directions as to involve the risk of collision, steam vessels shall keep out of the way of the sailing vessel."

"Art. 22. Every vessel which is directed by these rules to keep out of the way of another vessel, shall, if the circumstances of the case admit, avoid crossing ahead of the other.

"Art. 23. Every steam vessel which is directed by these rules to keep out of the way of another vessel shall on approaching her, if necessary, slacken her speed, or stop, or reverse."

26 Stat. 320.

Under these regulations the schooner had a right to expect that the tug and ship would keep out of her way, until it was too late to have avoided the collision on her part. The fact that, from her position, those on board the tug and ship supposed she was bound in, and would tack to starboard, and follow in the ship's wake, does not excuse their failure to take the precautions required of them to avoid a collision. It merely explains their failure to do so. The schooner had a right to be where she was, and, if those navigating the tug and ship saw fit to act upon an assumption of their own as to what she intended to do, they did so at their peril. It may have been a very natural conclusion that the schooner was bound up the river; but it was negligence to substitute such a conclusion for those precautions to avoid a collision, easily taken, which prudence would suggest, and which the law requires.

The claim is made by the owners of the schooner, in their libel, that both the ship and tug are liable; but, on the hearing, this claim as to the tug was not urged. It was not abandoned, but the opinion was intimated, if not expressed, that the ship alone is liable. On behalf of the ship it is contended that the schooner and tug are both responsible, and for the tug it is conceded that the schooner was not in fault, and the entire responsibility is charged upon the ship. The opinion already expressed disposes of the question of negligence on the schooner's part, and the question for decision is whether the tug, or the ship, or both, are liable for the damage libelants have sustained.

In the case of The Civilta and The Restless, 103 U. S. 699, upon facts essentially like those in the present case, the tug and ship were both held liable. The course of the tug, with the ship following in her wake, and that of an approaching schooner, varied but little from parallel lines. These courses crossed each other either just ahead of the tug, or between the tug and ship. The tug did not change her course until the schooner was up to her, or nearly so. The ship struck the schooner on the port side, and sunk her. The schooner's lights were burning brightly, but were not seen by those on board the tug or ship. In that case, as in this, the controversy was mainly between the tug and the ship, in an effort of each to throw the responsibility for the accident upon the other. The court held that the tug and ship, being in

law one vessel, and that a vessel under steam, were obliged to keep out of the way. Both vessels were, as in this case, under the general orders of a pilot on board the ship; but, as in this case, the tug actually received no orders from the pilot. The court say:

"Being on the ship, which was two hundred and seventy feet astern of the tug, it is not to be presumed that he was to do more than direct the general course to be taken by the ship in getting to her place of destination. The details of the immediate navigation of the tug, with reference to approaching vessels, must necessarily have been left to a great extent to those on board of her. She was where she would ordinarily see an object ahead before those on the ship could; and, having all the motive power of the combined vessels under her own control, she was in a situation to act promptly, and do what was required, under the circumstances. That this was expected is clearly shown by the fact that down to the time of the collision the pilot on the ship had found no occasion to direct her movements. Her own pilot or master seems to have managed the navigation satisfactorily. We do not entertain a doubt that, situated as the tug was, in the night, so far away from the ship, it was her duty to do what was required by the law of a vessel under steam, to keep herself and the ship out of the way of an approaching vessel; particularly if the pilot of the ship did not assume actual control for the time being of the navigation of the two vessels."

It is contended for the tug that the points wherein the facts of the two cases differ show the tug's nonliability. In this case the collision was in the daytime. The ship was in a position where those on board could see the approaching schooner as readily as she could be seen by those on the tug. The ship had her sails set, so that the tug did not have all the motive power. Do these points of difference relieve the tug from a liability to which she would otherwise be subject, upon the conclusion reached in the case cited? Duty to act is the test of liability. If that duty was upon both vessels, both are liable; otherwise, the responsibility must rest upon the vessel solely responsible for the direction of both vessels. The ship is responsible because the pilot on her had general charge; but, in the absence of orders from the pilot, it was the duty of the tug to act upon her own orders in any emergency that might arise. In this case the ship was much further astern of the tug than in the case of The Civilta and The Restless, and the presumption that the pilot was not to do more than direct the general course of both vessels was therefore stronger than in that case. It is not a matter of vital difference that one collision occurred in the night and the other in the daytime. The difficulty of seeing approaching objects required increased care; but when such objects are seen, and danger is imminent, the excuse of responsibility to the orders of a superior cannot be allowed, when the circumstances did not warrant the expectation of such orders, and there were in fact none. The decisive fact in this case, as in that cited, is the fact that the details of the immediate navigation of the tug were necessarily, to a great extent, left to those on board of her, and were assumed by them. The daylight enabled the ship to see clearly, but, while this increased her responsibility, it did not lessen that of the tug, whose opportunities for seeing were equally good. And so of the fact that the ship's sails were set. This was to aid the tug, and, if this constituted negligence on the ship's part, it furnishes an additional ground of liability. With or without this circumstance, either the ship or the tug, in the exercise

of the care required of them, could have avoided the collision. Neither of these vessels can shift the entire responsibility upon the other by establishing the other's negligence, so long as its own negligence appears.

It is urged in behalf of the tug that she was not negligent. Her officers testify that she fell off 2½ points, so as to pass under the schooner's stern, in time to have avoided the collision, if the ship had followed her course; and the testimony of the captain of the Peru is cited to corroborate this contention. He testified that he came on deck when the ship was a little more than a mile distant from the schooner, and that the tug was then "a little to the leeward on a straight line,—about a quarter or half point to leeward." He subsequently explains that there was a little sheer now and then, which he did not "consider as a steering out of the way or altering the course." Cordiner, a Columbia river bar pilot, who was on the tug at the time, testified that he saw that she (the schooner) was coming right out towards them, and that she was not going ahead much,—"just enough so that there would be trouble if the tug kept its course; saw that we could not keep on our course, and we kept away." He testified that the schooner was about a mile and a half to a mile and a quarter distant when the tug first began to keep away,—about 2½ points; "just shaped her course for the stern of the schooner"; that, "when the captain of the tug saw the ship was not following the tug, he put his helm hard a-port, and threw the tug right a-beam the ship nearly." Howes, the captain of the tug, testified that he started to keep off when the schooner was about a mile or a mile and a half away; that at that time he gave orders to the mate of the tug to put his wheel up, keep the ship off, and pass the schooner. "I said, 'If we can't cross her bow, we will have to cross her stern.' Q. After he had executed this order, did you observe what the ship was doing? A. The ship seemed to be going right along on her course. She didn't seem to keep off. Q. Do you mean that she didn't follow you? A. She didn't follow us; no, sir. She might have kept off a little, but not much, if any. Q. What did you do next? A. I pulled down that way, found the ship was not coming on fast enough, and then I told him to put his wheel hard up, hard a-port. I says, 'Don't get anywhere near that schooner. We want to give her lots of room.'" This testimony tends to show that the falling off of the tug, and what is called her "rank sheer to starboard," when, as Cordiner testifies, the mate put his helm hard a-port, and threw the tug nearly a-beam the ship, occurred at almost, if not quite, the same time. The captain of the Peru noticed the tug to leeward when they were a little more than a mile from the schooner. Pilot Wood saw nothing of a falling off of the tug until she made a sudden start to starboard,—"a broad yaw off to starboard,"—when he gave the order to "hard a-port, back the main yard, and lower the mizzen topgallant sail. At that time the spanker was partially down, coming down." Just prior to this he had given orders to lower these sails. The ship made off to starboard. When the tug got around, she stopped, and, in consequence, the ship lost headway. The pilot further testified that, if the tug had kept on pulling the head of the vessel around, she would have cleared the schooner; that 50 feet more would have cleared her. All of this goes to show that the tug neither received nor relied upon orders from the pilot on the

ship, and that both acted at the last moment, when, by acting a little earlier, no collision would have occurred. The order given by Capt. Howes of the tug—the first order given by him—shows that a collision was then imminent: "I said, 'If we can't cross her bows, we will have to cross her stern.'" This is suggestive of the probable fact that up to that time the tug had expected to cross the schooner's bow,—a thing she had no right to attempt, under the sailing rules prescribed by congress,—and that it was only when the vessels were in such close proximity that it appeared doubtful whether the tug could cross the schooner's bows that the order to put up the wheel was given. Those on board the Peru were of the opinion that if the tug had kept her course, or, having gone to starboard, she had continued to pull the head of the ship around, in either case a collision would have been avoided. This may be true, but speculation after the event is useless, in the face of the facts patent at the time,—that, if the tug and ship and schooner kept to their respective courses, there would likely be a collision, and that the tug and ship, in the confidence of an assumption, upon which they had no right to rely, that the schooner would not keep her course, but would tack and follow them over the bar, waited until there was no assurance of avoiding a collision in any measures that could be taken. The conduct of both vessels has the appearance of a most reprehensible indifference to a danger that was apparent, and that either could have avoided. The libelants are entitled to the relief prayed for.